[Cite as *State v. Jones*, 2024-Ohio-5935.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

COLUMBUS JONES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0053**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2011 CR 00167

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Chief*,* Criminal Division, Office of the Mahoning County Prosecutor, for Plaintiff-Appellee and

*Atty. Joseph C. Patituce, Atty. Megan M. Patituce*, Patituce & Associates, LLC, for Defendant-Appellant.

Dated: December 19, 2024

**Robb, P.J.**

{¶1} Appellant, Columbus Jones, appeals the April 16, 2024 judgment denying his postconviction application for DNA testing. Jones argues the trial court abused its discretion by concluding transfer DNA testing was available at the time of his trial. He also challenges the court's finding that a DNA exclusionary result would not have been outcome determinative. For the following reasons, we affirm.

<u>Statement of the Facts and Case</u>

{¶2} Jones was convicted of the murder of Jamail Johnson, improper discharge of a firearm into a habitation, and ten counts of felonious assault after a jury trial in August of 2012 based on the shooting of multiple individuals at a fraternity house. Jones was sentenced to 92 years to life. (December 18, 2012 Judgment.)

{¶3} He filed a direct appeal, raised four assignments of error, and this court affirmed the trial court's judgment. *State v. Jones*, 2014-Ohio-5915 (7th Dist.).

{¶4} In September of 2023, Jones filed an application for DNA testing seeking DNA testing of ten .40 caliber Smith and Wesson shell casings. Jones argued that 21 discharged shell casings were collected from the scene of the offenses, including ten .40 caliber Smith and Wesson shell casings, which were not swabbed or tested. Trial testimony placed the .40 caliber handgun in Jones' possession at the time of the shooting and showed it was the type of bullet that killed Johnson.

{¶5} In his application, Jones claimed no DNA testing of the casings was performed before his trial; DNA testing of casings was not yet available at the time of trial in 2012; and a DNA exclusionary result would have been outcome determinative. (September 5, 2023 Application.) In support, Jones relied on a court of common pleas case as showing that advancements in extracting DNA from casings were made after the trial of his case. Thus, he claimed to satisfy R.C. 2953.74(B)(1).

{¶6} The state opposed his motion and argued the touch or transfer DNA that Jones was requesting was available at the time of his trial. Additionally, the state claimed the cartridge casings in this case were likely contaminated and would have not been suitable or acceptable for testing. The state alleged the handling protocols were deficient to preserve such evidence, which would result in contamination and produce inconclusive

<u>Case No. 24 MA 0053</u>

results.  Last, the state urged the trial court to conclude that even an exclusionary result would not defeat the overwhelming evidence against Jones.  (November 20, 2023 State's Response.)

**{¶7}**  The trial court overruled Jones' application, concluding in part that cases existed at the time of Jones' trial reporting the use of expert testimony on transfer DNA and it was available and admissible at the time.  In addition, the trial court found even if the testing were obtained and excluded Jones as a contributor of the DNA from the casings, this fact would not have been outcome determinative.  The court reiterated the testimony and evidence at trial, emphasizing how one individual testified that Jones "essentially confessed" to the shooting; one person testified he saw Jones fire multiple shots into the back of the home; and four other people saw Jones with a gun either before or after the shooting.  Thus, the trial court overruled Jones' application for DNA testing. (April 16, 2024 Judgment.)

**{¶8}**  Jones raises two assignments of error on appeal challenging both aspects of the trial court's judgment.

Application for DNA Testing

**{¶9}**  Applications for postconviction DNA testing are governed by Chapter 2953 of the Ohio Revised Code.  R.C. 2953.74 dictates a court's responsibilities when considering an application.  Jones sought DNA testing under R.C. 2953.74(B)(1), which states:

> If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the court *may* accept the application only if . . . the following applies:
>
> (1) [a.] The offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, [b.] the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at that trial stage in that case, *and*, [c.] at

the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.

(Emphasis added.)

{¶10} All three prongs must be satisfied, and even then, the statute places the decision to grant the application in the court's discretion in light of the use of the word "may." *State v. Barnette*, 2024-Ohio-1172, ¶ 37 (7th Dist.), *appeal not allowed,* 2024-Ohio-2373, citing *State v. Buehler,* 2007-Ohio-1246, ¶ 31-36 (8th Dist.) (if DNA testing would not be outcome determinative, the trial court need not evaluate the other criteria). Thus, a court's conclusion that one criterion from R.C. 2953.74 is lacking means it need not evaluate the other applicable sections. *Buehler,* at ¶ 29-31; *accord State v. Bunch*, 2015-Ohio-4151, ¶ 62 (7th Dist.).

{¶11} We review postconviction applications for DNA testing for an abuse of discretion. *State v. Scott*, 2022-Ohio-4277, ¶ 10 (12th Dist.). Thus, we must affirm unless we find the trial court's decision was unreasonable, arbitrary, or unconscionable or the trial court took "a view or action that no conscientious judge could honestly have taken." (Citation omitted.) *State v. Brady*, 2008-Ohio-4493, ¶ 23 (11th Dist.).

<u>Testing Available at the Time of Trial</u>

{¶12} Jones' first assigned error asserts:

"The trial court erred in denying Appellant's Application for Post-Conviction DNA Testing pursuant to R.C. 2953.74(B)(1) because the technology Appellant seeks to utilize did not exist at the time of his conviction."

{¶13} Jones challenges the court's finding regarding prong c. of the R.C. 2953.74(B)(1) test, i.e., whether "at the time of the trial stage in that case, . . . the DNA testing was not yet available."

{¶14} As argued, ten .40 caliber and eleven .45 caliber empty cartridges were recovered from the area where the shooters were standing. (Tr. 2098). (Sixteen were discovered the night of the shooting, and six were recovered later with a metal detector after the snow melted.) Michael Roberts, a BCI firearms section forensic scientist, testified at trial that all of the recovered .40 caliber cartridge casings were fired from the same weapon. (Trial Tr. 2102-2104.) Two .40 caliber bullets were removed from the

murder victim, and a .40 caliber bullet was also removed from a female victim who was shot in the face. (Tr. 2129-2130). *State v. Jones, supra*, at ¶ 43.

**{¶15}** Jones seeks testing of the ten .40 caliber casings recovered at the scene. He claims that touch or transfer DNA testing from casings was not available at the time of his trial, and as such, these items should be swabbed and tested now.

**{¶16}** He claims that although there was transfer DNA testing at the time of his trial, there was no method to secure transfer DNA from spent casings in August of 2012. Jones contends the trial court abused its discretion by disregarding these advancements.

**{¶17}** In rejecting this aspect of Jones' application, the trial court cited two cases for the proposition that DNA transfer evidence was generally acceptable and available at the time of his 2012 trial.

**{¶18}** First, the trial court referenced *State v. Freeman*, 2008 WL 142299, as demonstrating that touch DNA was available in advance of Jones' August 2012 trial. In *Freeman*, the Missouri Court of Appeals, Southern District, summarized the testimony of Jason Wycoff, a DNA analyst/ criminalist with the Missouri State Highway Patrol Crime Laboratory offered at trial:

> According to Wycoff, DNA can transfer. One can transfer one's own DNA by shaking hands or touching someone else, i.e., skin-to-skin transfer. Transfers of one's DNA can occur by skin contact with an object, such as skin to clothing. Transfer can also occur in the other direction. The DNA of someone who has previously worn that clothing can transfer to the skin of someone who later wears that clothing. In such a situation, Wycoff would expect to find a mixture consisting of the DNA from both persons. Transfer can occur between two people or a person and an object without any physical contact.

*Id.* at *5. DNA testing was done in that case and included DNA obtained from beer cans, tissues, a nylon stocking, and pieces of toilet paper. *Id.* at *7-8.

**{¶19}** Although *Freeman* does not specifically address transfer DNA obtained from spent casings, it verifies the general availability of transfer DNA testing in 2008— well in advance of Jones' trial.

Case No. 24 MA 0053

{¶20} The trial court also relied on *Saucier v. Commr. of Correction*, 139 Conn.App. 644, 646-47 (2012), to support its conclusion that touch or transfer DNA evidence was available at the time of Jones' trial. *Saucier* was decided in 2012 and involved arguments about whether counsel was ineffective for his alleged failure to procure a DNA expert to testify at trial about the possibility of indirect DNA transfer from one person to another. *Id*. *Saucier* did not involve transfer DNA on spent casings, but acknowledges the general availability of the technology at the time of Jones' trial.

{¶21} Further, the state directs us to *State v. Noling*, 2018-Ohio-795, ¶ 18. In that case, there was argument concerning the preferred lab to secure DNA testing on the shell casings among other things. However, *Noling* was decided in 2018, six years after the trial in this case. *Id.*

{¶22} The state also refers us to *State v. Smith*, 2021-Ohio-378, ¶ 9-10 (8th Dist.). In *Smith*, a forensic scientist and DNA analysist testified she conducted DNA testing on several pieces of evidence, including a water bottle and spent cartridge casings from the murder site. However, *Smith* was decided in 2021, and the trial was held in 2019, both were after the trial in Jones' case.

{¶23} Regardless of the quality or quantity of cases verifying the availability of touch or transfer DNA from discharged casings at the time of Jones' trial, it is undisputed that the collection and detection of transfer or touch DNA was generally available at the time.

{¶24} Importantly, R.C. 2953.74(B)(1) authorizes a court to accept an application for DNA testing if "at the time of the trial stage in that case, . . . the DNA testing was not yet available." Nothing in this provision mandates that caselaw exists showing a specific item in a certain condition is amenable to the testing sought in application for DNA testing. Instead, the statute generally requires that the DNA testing sought "was not yet available." *Id.*

{¶25} In light of the specificity of Jones' argument and generality encompassed by the statute, we decline to find an abuse of discretion here. Touch or transfer DNA testing was available at the time of Jones' trial, and as such, Jones' first assigned error lacks merit.

**{¶26}** Because the governing statute requires the satisfaction of all three prongs, we need not assess Jones' second assignment of error. Nevertheless, we address it in the interest of justice.

<u>Outcome Determinative</u>

**{¶27}** Jones' second assignment of error asserts:

"The trial court erred in denying Appellant's Application for Post-Conviction DNA Testing finding a result would not be outcome determinative."

**{¶28}** Jones challenges the second prong of the R.C. 2953.74(B)(1) test, i.e., upon considering all available and admissible evidence, whether Jones showed a DNA exclusion would have been outcome determinative.

**{¶29}** He urges us to find that, assuming he was excluded as a DNA contributor after touch or transfer DNA testing of the ten discharged .40 caliber casings, the jury would have found in his favor because this would have created sufficient doubt about the evidence against him. Jones emphasizes the lack of DNA evidence offered at trial, as well as the inherent deficiencies of eyewitness testimony. Jones also contends the eyewitnesses' testimony should not be given much weight in light of their varying statements and inconsistent identifications of him as the shooter. For the following reasons, we disagree.

**{¶30}** R.C. 2953.71(L) defines outcome determinative in this context and states:

(L) "Outcome determinative" means that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, *there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense* .
. . .

(Emphasis added.)

**{¶31}** R.C. 2953.73(D) states:

[I]n making the determination, [the court] shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript and all responses to the application . . . .

{¶32} Some of the available and admissible evidence included the following.

{¶33} Andre Miller testified he was 100% sure Jones was the man with the gun that night. Miller said he recognized Jones on the news that night, but did not realize he identified the wrong person in the photo array because Jones' hair was different at the time of the shooting from that depicted in his driver's license photo. Miller likewise said his face was thinner. *State v. Jones*, 2013-Ohio-5915, ¶ 30, 39 (7th Dist.).

{¶34} Marquel Smith said he drove Jones to and from the party that night. Smith confirmed that Jones had a gun on him, and on the way home, Jones said he "aired it out" and did what he had to do. *Id.* at ¶ 31-33.

{¶35} Durrell Richardson testified and said Jones flashed a gun on the night in question, and Jones later was outside with his gun drawn when the shooting began. Richardson said Jones was one of two people who aimed a gun at him. *Id.* at ¶ 36.

{¶36} Braylon Rogers testified that he had a 9mm handgun on him that night and Jones was carrying a .40 caliber handgun. Jones had his gun passed to him through a window during the party. Rogers testified Jones stated he was going to "air this out" before shooting toward the porch and into the back of the house. Jones fired multiple shots. *Id.* at ¶ 39, 44.

{¶37} As the trial court summarized, at least four individuals testified that Jones had a gun in his hand immediately before or after the shooting and at least one person testified that Jones fired multiple shots into the home.

{¶38} Furthermore, while R.C. 2953.74(B)(1) requires a hypothetically exclusionary result, the statute does *not* require the court to presume the DNA of another was identified. Moreover, assuming Jones was excluded as a DNA contributor and another individual's DNA was present, the state could challenge the results. For example,

the state could have presented testimony about factors affecting DNA identifications via this method, including the manner in which the casings were collected, handled, or stored, and whether the casings were found in the snow, among other factors. The state also could have argued someone else loaded the weapon or Jones was wearing gloves as reasons why his DNA was not found on the casings. Evidence that another person handled the casings does not negate the other evidence against Jones. *See State v. Harwell*, 2022-Ohio-2706, ¶ 37 (2d Dist.).

**{¶39}** Even if Jones were excluded as a contributor to the touch DNA obtained from the .40 caliber casings, we cannot conclude there is a strong probability that no reasonable factfinder would have found him not guilty of the charged offenses. There was overwhelming testimony against him. Jones' second assigned error lacks merit.

Conclusion

**{¶40}** Based on the foregoing, both assignments of error lack merit, and the trial court's judgment is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 24 MA 0053

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**